v. Acceleron, LLC. Ms. Heyman, please proceed. Am I saying your name right? Heyman. Heyman. Your Honor. Sorry. Heyman, please proceed. Thank you. Good morning. May it please the Court. My name is Paula Heyman, and I'm here on behalf of Dell. The first thing I'd like to address today is the legal error by the Board in determining whether the prior art HIP reference discloses the limitations of Claims 14-17 and 34-36. To illustrate this error, I'd like to focus on the Board's decision with respect to Claim 14. In the final decision, the Board only performed half of the analysis required to determine whether the prior art patent Can I ask you a question? Sure, Your Honor. Do I understand right that you do not read network, what's the phrase, network? NAS. Yeah, NAS. As covering, as a term of art, any device on which you can store stuff that's attached to a network. It's actually, as a term of art, somewhat more specific than that. There are things in the market called NAS, and there are other storage devices that might be connected to a network that are not NAS. That is correct, Your Honor, yes. Isn't that a problem? Because HIP does not say and does not require inherently that the OS be fetched from the NAS. Is it 54? Yes, it is. That's right. No, it's our position that that's not a problem. Inherency was not argued below in the IPR. Dell did not argue inherency. What is at issue here is what requires further programming. No, but you only get to the further programming of Typhoon in those cases if there is an actual disclosure of booting from a NAS as opposed to booting from LAN. And that's a factual question, not a legal question. What does HIP disclose? When it says booting from a LAN, is it actually disclosing booting from a NAS, though it may not be telling you how to do it and though there may be additional programming that's necessary to achieve it? But the factual question that you lost on at the board is they concluded that HIP, when it says booting from LAN, doesn't include NAS and doesn't disclose booting from a NAS. They didn't decide this case on the idea of one wouldn't know how to future program to make it happen. They decided it on a lack of disclosure, and not because the programming isn't there, but because there's no actual disclosure of even doing it. Forget about how you do it via programming. So that's a fact question, and that's a substantial evidence review. So I personally don't even get to your legal point on Typhoon and programming because there's a substantial evidence standard of review here, and the board found HIP doesn't disclose the fact that you need as the predicate. Well, it's our position that the board overlooked the evidence that is in HIP. If you actually look in HIP, HIP discloses. Show me column and line number where HIP discloses the booting from a NAS, because I thought you hung everything on this one little phrase. Where is it? So can you show me what? 464, column 9 at the bottom. Yeah, exactly. Show me what you would, yes, column 9, line 61. 61 to 62, yes. That is boot from LAN, and Dr. Horst has testified, and his testimony is uncontested, that boot from LAN, and it's in quotes in the patent, means it is an industry standard for remote booting over a network. But that's why I asked you the question. There are other storage devices in HIP, so it doesn't have to boot from 54. It could boot from other things. Correct. That's where the looking at the Fantasy Sports and FinGen cases helps the analysis, because if there is programming to boot from any device on the network, meaning boot from LAN, you boot from any device on network 30 in HIP, FinGen and Fantasy Sports tell you that it's not further programming if you select from an existing option. But I'm still not even at that point yet, because you still haven't shown me how HIP discloses booting from a NAS. I don't have a problem with your programming argument. I just don't get there. And so far, you haven't at least satisfied me on that. So do you want to show me the Horst testimony so that I can try to get with you on point one? Because if you don't get me on point one, I never get to your point two. The Horst testimony is at paragraph 59 of his declaration, and that's A744 to 745. And actually, the quote about the boot from LAN and remote booting being standardized, that is on page A745, a few lines down. OK, so I'm on 744 and 745. What sentences do you want me to focus on? If you focus on the second sentence on that page, it says HIP further describes the capability of the web server processing card 32 to boot from LAN, where boot refers to initial operations a computer undergoes on power-up, including loading the operating system, and LAN is an acronym for local network. But I mean, it's the same problem. I mean, it discloses broadly that you can boot from LAN. It also discloses network-attached storage, but it doesn't say that you can boot from the network-attached storage. HIP does not explicitly say that. That is correct. Why isn't that an anticipation problem then? I mean, it sounds like it may have been obvious to one of skill of the art, but you didn't ask for this to be invalidated on obviousness grounds. We did not. And actually, both experts have agreed that a boot image can be stored on any one of the devices of the network of HIP. That's not the same thing as disclosing it in a particular reference. The fact that it could be done, the fact that boot from LAN actually implicates at least five different things that I can think of off the top of my head, and one of them might be NAS, doesn't mean it's disclosing NAS. That's the problem. Anyway, maybe instead of focusing on the—are there any other issues you'd like to turn to? Unless there's something else about this issue. With respect to those claims— Let me just clarify because I was a little—because the claims 34 to 36, you did ask for an obviousness finding, but as far as I can tell, you didn't try to separate out the legal argument on 14 from 34 to 36. Is that right? Yes, I believe that's correct. I mean, on this issue. I believe that's— This issue for both of those. We relied on the same portions of the HIP reference. That is correct. I guess I'm in my rebuttal time, and just one minor point on claims 34 through 36. We believe that there was no obviousness analysis performed by the board at all with respect to those claims. Can I—I'm going to switch topics, and I know you're going over your time, but on the cross-appeal, my understanding is that the reliance on the unnumbered slide—this is, I guess, claim three— was raised for the first time during the oral argument. I didn't see anything in any papers before. Why does that all by itself not require a vacator? Because the other side simply did not have an opportunity to respond to the sole thing that the board relied on for one of the required claim elements. Your Honor, that issue was not raised for the first time at oral argument. Figure 12 of HIP was cited in Dell's briefing. I have that briefing right in front of me. It's page A244. Why don't you open it up to that page? Page A244. This is the portion of the reply brief, which is the only thing that you reference. It's not earlier, right? It's only the reply brief. That is correct. And on page 244, you do reference figure 12, but importantly, you don't just stop at figure 12 generally. And that would be a little odd, right, just to say, oh, the whole figure is somewhere on there. We're not going to tell you where. You actually tell them where. You say element 278. Element 278 is the back plate. That's the thing with the holes on the back. That's not the portion of figure 12 that the board found amounted to a caddy, is it? It is a part of what the board found. No, no, no, no, no, no. The board found that little thing that it sits on top of is the caddy, that little tiny unnumbered thing on figure 12. Yes. 278 has nothing to do and is in no way connected to those slides on the bottom. Look at the picture. They're not connected in any way, but discrete elements. The slides, Your Honor, however, help align the – they allow the power supply to slide in to the chassis, and they align those connectors. They help the connectors align. The slides are the only thing the board found amounted to a caddy. It didn't say the slides in combination with the mounting frame and the door and the 278. The board didn't find element 278 was part of a caddy. The board found the slides were a caddy. You didn't point to the slides at all in figure 12. You directed the board to figure 12 and in particular to element number 278 particularly. And that's not the same thing. If I point the board to a capacitor and say, oh, yeah, that's the element, and then it turns out it's not the capacitor at all. It's a transistor on the other end of the circuit. It happens to also be pictured. How does that give them an opportunity to respond to your argument? Your Honor, during the oral hearing, it was questioned by – I believe it was Judge Gianetti to Dell. Judge Gianetti asked us about – we were talking about caddies. And figure 12 was discussed. He was asking about figure 12, and that's when – Nobody disputes that. Nobody disputes that figure 12 was discussed. But prior to that oral argument, there had never been even a tiny suggestion by anyone that those slides amounted to the caddy. In fact, your suggestion only brought up in the reply brief wasn't that the slides amounted to a caddy. It was rather the element – a totally perpendicular and separate element amounted to the caddy, 278. And then I went back and read all of your – Dr. Horst's testimony, which was also cited in your reply brief, to see is it possible Dr. Horst testified to that. He did not. He testified to the door, which is 262, and the frame on the outside could amount to a caddy. Never did he ever point to, talk about, or discuss those slides anywhere. So you have no expert testimony on that. You did not cite it in your reply brief. Then it comes up in oral argument. You might win on it, but there are some procedural things. I mean, why don't they – how about this? If I read it the way I just suggested, doesn't it have to go back for them to have an opportunity to respond? No, Your Honor. We don't believe it does. The guidelines at the board say no new evidence, no new arguments. This wasn't a new argument. We were arguing about caddies, whether caddies are present or not. That just makes it seem like it was – I don't know. I think this is not quite the right term, but invited error. You didn't do it sua sponte, but nevertheless the board found a claim element on a basis that the other side had never been given an opportunity to respond to, including by putting in evidence. And I don't think you've made a case here for harmless error. That is, once you see the slide, there could not possibly be a factual dispute about that satisfying it, which would be a slightly odd argument if you had never even thought of pointing to that slide to satisfy the element. But you don't make a kind of harmless error argument on that for the board's reliance on the slide. No, Your Honor. And can I ask you about claim 20? So the board said the – and I'm going to probably misremember the language, but it said that that claim element of – that element of claim 20 requires a Ethernet path that, if somebody wanted to use for a particular kind of polling activity from the microcontroller to other stuff connected to the path, that they could. But – and I'm not quite sure how to ask this, but that feels to me – and I'd like you to just clarify and address and so on. It feels to me like that view is pretty unreasonable because to have the Ethernet path capable of a communication seems to give essentially no meaning or something like no meaning to the fairly detailed description of the activity, of the communication activity that could travel over that path, which presumably would enable – that same path could carry a thousand other kind of communications. It seems to be a kind of a real disparity. Why did they put all this language in there about polling? Why didn't they just say an Ethernet path between the microcontroller and those other devices, full stop? Or are there some Ethernet paths that couldn't allow the polling and some that could so it actually adds something? It's a little bit of a confused jumble, my question, but it feels like you're not giving – or the board's not giving enough meaning to this fairly elaborate description of the particular kind of communication that would travel over this path. It's our position that the board looked at the words of the claims, and I think if you look at the words of the claims, it is worded kind of oddly. It says a dedicated Ethernet path that provides the microcontroller a connection to poll. To do something. Right, and so what they're claiming there is the actual connection, the physical structure. Would any Ethernet path have the ability to carry this polling communication if the microcontroller got it into its head to send that communication? As long as the microcontroller – as long as that path connected the microcontroller to the other stuff in the system, the other modules. But it's not just talking about any Ethernet path. It's talking about a dedicated Ethernet path that's separate from the other one that's there so it can remotely poll. And I understand there's a reason for that, so that if some part of it goes down, it doesn't all go down and it can still do the polling. Why isn't that specific function part of that claim? It seems to me you're making kind of inconsistent argument here on Claim 20 as opposed to what you were talking about earlier about it has to be capable of that function but doesn't have to actually do it. You're reading out the remotely polling here and saying it just has to be capable of it, whereas before you're saying it just has to be capable of it, it doesn't actually have to say it. Why isn't that inconsistent findings by the board here on this issue? The words of the claims that we're looking at, Claim 14 and Claim 20, are different. Claim 20 is a BIOS for instructing. That has to be programmed to do that instruction. But this is an Ethernet path with a connection for remotely polling. Are you saying the difference here is it uses the word to instead of for? No. No, Your Honor, we're not. No, you focus on the word that the claim says that you have a dedicated Ethernet path that provides a connection. To remotely poll. To remotely poll, that's correct. Would the scope of the claim be any different if you drop those three words out in your view? So it said provides an Ethernet path that provides the microcontroller module with a connection to the CPU module, the power module, and the Ethernet switch module. I don't think the scope would be any different, Your Honor. That's a problem, right? Because then you just haven't given meaning to, or the board hasn't given meaning to, the inclusion of those words. Is that wrong? Again, I think focusing on the words of the claims, what is being claimed is a structure. It's a wire that's being claimed, not the signals that flow along that wire. So that would be our position. I think that we should move on and hear from Mr. Crane. Don't worry, I'll restore some of your rebuttal time. It certainly won't be eight minutes, but I'll give you some back. We'll see. Mr. Crane. May it please the Court. I would like to pick up, if I may, with regard to an issue that was addressed with Claim 3 and the court asking about whether or not if the court agrees with Acceleron is to vacate the PTAB's ruling an appropriate result. And certainly we would understand that that could be a result that this court could choose to take. But I would also point out that the court could choose to also reverse the PTAB on that specific point because, as Acceleron has put forward, we do believe that this argument was addressed for the first time in regard to the slide structure in the HIPAA. But if that's a procedural error, which is the premise of your question, why is that not a fixable procedural error? That is, on remand the board could have to say, by the way, we're looking at this slide. Take 30 days and give us whatever evidence and argument you have about why that slide is not a caddy. I do agree that that is a path that the court could take. I also believe that a path that is available to the court is to simply reverse on that point for violation of the promulgated rules of the PTAB, and that is the only element that the PTAB offered. Aren't we generally under an obligation, and maybe the APA even says this or something, that only prejudicial procedural errors should be a basis for, I mean, here what you're asking for is outright reversal. We don't know if this is prejudicial. With regard to the substantial prejudice element, is that what you're asking about to Acceleron? Do I understand your question? Some notion that the fact that you were denied, that you were not given, I should say, an opportunity to address a fact on which the board ended up relying, we don't know if that was prejudicial to the ultimate outcome on Claim 3 because if you're given the opportunity, maybe you put on evidence and the board says, that's completely wrong. With respect to that question, Judge, the Align Tech case, if I understand it correctly, suggests that because the PTAB did not waive any rule or suspend any rule, we're not required to show substantial prejudice. However, I do believe that we are substantially prejudiced by the fact that we were not given that opportunity. Let me ask you this. Assuming you had been given the opportunity and you'd known that they were going to point to this and the board did find that this unmarked portion was a caddy, could that be substantial evidence to support the anticipation finding? We believe it would not be and for several reasons. For one, the word slides is not even recited in the HIPP pathway. It is also the difference, and this goes back to the claim construction issue that Acceleron offered. Acceleron offered the claim construction that a slide is a carrier for a module. I'm sorry. Right, so let's put that aside. Okay, right. Assume that. Well, and to answer your question, Judge Hughes, it has to do specifically that the slide is permanently attached to the chassis because the carrier for a module includes a notion of transportability. So the fact that if you look at the pictures, I believe we included it in the main brief, in the red brief, it appears to be permanently attached, so it can't be a carrier in that notion. It appears to be merely a pedestal, much like this podium or the table, that is permanently fixed, so therefore it cannot be the claimed caddy as it was construed. It doesn't protect the modules, which is another notion of a caddy that we discussed in our brief. And perhaps most importantly, because Claim 3 says that caddies provide airflow, the slide structure appears to actually block the airflow. But how do we know that? I mean, these pictures are all very, I mean, they don't have much detail. It's very hard to figure out what any of them are doing, including your pictures and your description of what your carrier is. I mean, that all seems to be very specific fact-finding that should have been done by the Board. We agree that it was an issue that should have gone up before the Board, and we have the opportunity to respond. We do believe that it is clear that this slide does not rise to the issues. I mean, we try to point these things out. I'm not aware of any evidence in the record that discusses this. So therefore, for that reason, because it was brought up at the juncture where it was, I believe this Court could decide that the PTAB violated its rules and that that would not be a claimed caddy. Was there some evidence from maybe the other side's experts that if one thought for a minute about what that slide must be like, it really must amount to two separate runners because nobody would put one of those down there that was a single pallet or something without the ability for air to flow front to back? I'm not aware of any, as I think of the record. And I think that further solidifies the point of its late arrival into this PTAB proceeding. I don't recall having attended the depositions and having gone through the record. I'm not aware of any. With respect to, I'd like to move to Claim 20, if I may, and speak to the polling notions. We absolutely do agree that to remotely poll is a functional limitation. We find that this appears to be similar. It's a functional limitation in this structural claim? Correct, that this is an apparatus claim. Yes, so how is it a functional limitation? We find it to be that there is the function of the microcontroller module to remotely poll the CPU module, the Ethernet switch module, and I believe the power module. And as the court spoke about a moment ago, that there is a dedicated Ethernet path between point A and point B that provides the connection. This claim would certainly have been a lot clearer if you had said a microcontroller module to remotely poll the CPU, wouldn't it? Perhaps it may have been, yes. That's all I, perhaps it may have been? That's as far as you'll go, really? Okay, this is going to be a deposition, I see. All right, well then, if, I don't understand. If something has to have a certain capacity, and in this case, this claim element is not directed to what capacity the microcontroller module has to have. It's actually directed to what capacity the Ethernet path and the connection has to have, isn't it? Isn't it directed, isn't this claim element directed to what the capacity of the Ethernet path has to be? The claim element as a whole, I don't believe that's correct. I believe that it points to... ...in the claim element. The where-in clause? A microcontroller module and a dedicated Ethernet path, where-in, a dedicated Ethernet path, blah, blah, blah, blah, blah, blah, blah. So, right, isn't the where-in clause directed to the capacity that the Ethernet path must have? I don't believe it's limited to that. It certainly starts out with that, and it's, you know, it... The way I see this claim is that it provides for, it gives a structure on one side, structure on the other side, and then, Judge Moore, as you talk about, it connects the two with a dedicated Ethernet path. But it doesn't stop there. And it goes on to tell us that the dedicated Ethernet path is different from another type of connection, Judge Hughes, which I believe you pointed to. And then it also tells us why... Then it gets into the functional aspect of this claim, that the microcontroller module, and I don't believe anyone has suggested that the microcontroller module is not the device that is the device configured to remotely poll. But that is what it does. And if we take that out, then it could be anything. I think we spoke about in the brief that you could, you know, if this language, as the PTAP concluded, is not a requirement of the claim, then you could have said anything there. But because the patentee chose to put that language in, it has to have some... I take it you think there's an important reason for having this dedicated Ethernet path rather than just saying the microcontroller itself can poll the CPU over any Ethernet path. I think that's correct, Judge, and I can't think where this was in the record, but I do seem to recall that you have these separate highways, if you will. You have one between the CPU modules, and that's where your data is, and you want to give that priority. And then you have this separate one so that the microcontroller module can also communicate with them. I think that may be the purpose behind it, and I think that may have come out, but I don't recall exactly where. So with regard to Claim 20, we certainly believe that that claim limitation has meaning and was improperly construed. This is the PTO, and you might be right under a Philips construction, but they have to employ the broadest reasonable construction. And so given the way that this is worded, where the where-in clause modifies not the microcontroller but expressly the dedicated Ethernet path, why isn't the broadest reasonable construction the one that the PTO chose, which is wherein the dedicated Ethernet path provides a connection that is capable of doing this? It doesn't mean the microcontroller has to do it. It just means the Ethernet path has to provide a connection that's capable of doing it. Because, Judge, even with broadest reasonable construction, we still look at the specification. We still perform – look at the claims as a whole, look at the specification. And I believe when we do that, we see that it is not just all about the dedicated Ethernet path. The dedicated Ethernet path clearly performing or serving as the connecting communication, no doubt about it. But when we look at the specification, we are further informed that the to-remotely poll has a significant function with the microcontroller as it communicates and reaches out and asks for and obtains certain health information. It's interesting that if I don't think this language is quite as clear as you would like me to think it is, because I don't think it's clear, that there's something in the specification that really makes it clear, if there's any ambiguity in this language, what it ought to be. Show me what in the specification, in particular, line and column number, you think is your best evidence for why that is. Certainly. I'd like to direct the court's attention, if I may, to page A37. I just have the patent, so tell me line and column number. Okay, sure. Column 7, starting approximately around line 45. And the reason I want to start there is that we have to look at the structure and looking at it as a whole. And that structure, that paragraph starts talking about figure 5, and it is the microcontroller module. The microcontroller module around line 45, you see, it tells us there's a standalone microprocessor, and we see that it also has flash memory, an operating system, and application software. I believe the application software is significant in that that is where we expect to find this software, this preconfigured software for the structure or the function to remotely poll. Reading down, the next paragraph talks about how you would insert... Is the dedicated Ethernet chip at 506 providing connection to the network, is that the structure you would say corresponds to the structure in the where-in clause that we're discussing? I'm not sure that that's correct. That's why I'm asking, I don't know. Yeah, I don't think that it is. I think the dedicated Ethernet path would actually be the data communication path between what is in figure 5. The Ethernet chip is what is going to send stuff over the path. I think that it would be correct in that communication path. It may be the last chip. And then when you get down to line 62, is that what you're going to read? That's where I was going next, yes. And that's where we see after the very first thing, after the preceding paragraph from 50 to around 61 about the insertion of it, the first thing that it tells us is, as you see, the microcontroller module uses a dedicated Ethernet path separate from the network to remotely poll these three modules, the powered module, the Ethernet switch module, and the CPU module. And then that language goes on to tell us the types of things that it is gathering, health information about the CPU. Now I'm in the column 8, in the first few lines in column 8. It also talks about voltage levels, CPU temperatures, fan RPMs. So there's various types of data that it goes out and asks these devices for and gets them. And then if you continue reading on in column 8, you will understand the reason it does this is so that it can maybe predict that this unit is not performing to the level that it's supposed to that could indicate a failure, and then you could alert someone and maybe something could be done about it with the hot swap ability. So I think that would answer your question, Judge Moore. That would speak to the issue that you asked. Well, certainly in this preferred embodiment, the microcontroller does this. Is there any other function of it disclosed in the patent anywhere? I don't recall any as I stand here today. So you really think that the only thing that is disclosed in this patent for the microcontroller is to do this remote calling? That's all I can recall at the moment. It just seems strange to me to read that function into an apparatus claim. I think that you're probably right under a Philips standard, but it's a little harder for me under a BRI standard. And speaking to that point, I think that this reminds me of a NAZOMI, this court's decision in NAZOMI where you have a combination hardware-software claim limitation where you have the physical structure, the hardware, and then you have the software that is configured to perform the function. So if the court believes that it's just general capability, then perhaps I don't prevail on that. But if the court believes that it's something configured to perform that function, then I believe under the NAZOMI that it certainly is part of the structure. Can you clarify for me? It seems to me you're not – you clearly oppose what I think was the board's view, is that as long as the past could carry this communication about polling, then the claim is satisfied. It seems to me that there are two alternatives to that. One is that the system does actually conduct the polling, and then the other is I think what you're referring to as the microcontroller is configured to do so. Which of those two is your view? I think the board probably rejected both of them, but what is your view about the claim construction? We do believe that – I'm not sure I understood the first part of the two. The second part I certainly understand, and we do believe that the microcontroller module is configured to perform the function of polling. Would you repeat your first part again? So, for example, if it said the micro – what's the language? Ethernet path provides a microcontroller module with a connection on which the microcontroller polls the CPU module, etc. That would require that the microcontroller actually be doing something as opposed to configured to do it. Okay, I think I understand you. It is the latter that it is configured to poll is a position that we're at least trying to articulate, not the full. I see that I'm past my time. Are there any further questions? No, I think we have your case. Let's let her have some rebuttal time. Two minutes. I'm sorry. Simon? Thank you, Your Honor. I just want to address a couple of points. First, with respect to the board finding that HIP could poll with respect to Claim 20, the reason why the board found that is that HIP actually does disclose polling. And those HIP at 14 lines 46 to 49, and that's on page 466, discloses that the single-board computer collects, stores, and communicates information. I'm sorry. It was column 14. What line? 14, 46 through 49. Thanks. And also, in HIP, column 15 – Okay, hold on. Go slower. I'll give you more time. Don't worry. Column 14. What do you want us to take away from this? Lines 46 to 49. Yes. The single-board computer collects, stores, and communicates information to send to the management network, and it's collecting information about the modules in the system. So you're saying it actually polls? Correct. HIP actually polls? Correct. And that's why the board found Claim 20? The board found that – That's not the reasoning the board gave. The board found that it was capable of being programmed to do it. I mean, using the same reasoning you're trying to reject for the other claims. Your Honor – You're essentially arguing an alternative basis for us to affirm. Yes, Your Honor. We believe that HIP actually does disclose polling. And just one other site to give you. Lines 15, 24 to 30. Lines 15, lines 24 to 30? Yes. Okay. Oh, I see. That's the same thing. Telemetry data. Are there any other points you'd like to touch on quickly? Just very quickly for Claim 3. Although we do not believe any rules were violated with respect to Claim 3, Celeron did have an opportunity to respond to Dell's argument at the oral hearing. And also there is a procedure to file a request for a rehearing to point out what the board overlooked or misapprehended, which Celeron did not do. Okay. I thank both counsel for their argument. The case is taken under submission.